Oral argument not to exceed 15 minutes per side. Mr. Mazzoli, you may proceed for the appellant. May it please the court's honors. Good morning, Mr. Smith. My name is Michael Mazzoli. I'm here on behalf of the appellant, Freddie Knipp. I am honored to be joined in the courtroom by Mr. Knipp's son and father, both sitting in the back row here. I would like three minutes for rebuttal, please. That's fine. Mr. Knipp was convicted of two drug charges, both small, about one ounce to one and a half ounces, in December 2019, January 2020, and a transfer of a gun that he made to a guy named Larry Eldridge, who was a government informant. There were really two components to this case. You might call it a tale of two cases. One is the case of the charges themselves. That involved the informant, Larry Eldridge, but also investigators who were watching the events and text messages and video and audio to the effect of showing Mr. Knipp providing small amounts of drugs over a space of 11 weeks. Two deals and then capped off by the transfer of the gun. The other tale is a tale told by Larry Eldridge alone. That was a lurid story of large-scale drug deals, four to five ounces every time, every week, for up to a year, amounting to as many as 10 kilograms, depending on math, or four and a half kilograms. And that makes the core of our concern in this case. Was there a defense to the controlled bodies? Why wouldn't you say that that was just harmless, even if you think it was a 404B problem? What was the theory for why people would commit controlled transactions? That seemed to be quite overwhelming. I wouldn't call it overwhelming, Your Honor, but I certainly agree that it was not just the word of Larry Eldridge. I think that because Larry Eldridge's information about the big drug deals from the past, I think that created a kind of atmosphere in which it was easier and probably tempting for the jury to make a conviction without the evidence that they might usually require. The video, for instance. It was, you might call it incriminating, but it was not open and shut. It was not so clear that you could just watch the video and say that man's guilty. But I recognize that, in fact, that testimony is much more solid than Larry Eldridge's word alone, which is all the government had with respect to both the res geste testimony, which the jury heard of that, and then also the sentencing. And with regard to the sentencing, it's important, I think, to begin by noting that Mr. Knipp would be serving five years, thereabouts, under the sentencing guidelines recommendation for the crimes of conviction. He is doing 11 1⁄2 years, and that extra 6 1⁄2 years is all laid on the word of Larry Eldridge, and that alone. No corroborating evidence. Like, for example, he was describing something that would have put about $180,000 at least in Mr. Knipp's pocket during the period that they were supposedly doing this. And yet Mr. Knipp lived in a modest house, according to the investigators, drove a 20-year-old truck. No such wealth that you would expect. But on the back end of the sentencing, the district judge heard the testimony, heard Eldridge testify, and could assess his credibility live. And then we have a pretty difficult standard of review of fact-based sentencing challenges. So why do you think we should second-guess the district judge who so often testifies live? Well, I don't think I would ask you to second-guess. The judge, indeed, considered Larry Eldridge credible. But again, it is only the credible word of one government informant, and I think the judge made a mistake. But isn't there also the plea agreement? Eldridge's plea agreement in which he admitted to this quantity of evidence? Yes, Your Honor. But built into that was an understanding on a downward departure that basically the government, if he testified to those things that he was admitting in the plea agreement as well as cooperated as a witness, his sentence would not be for 10 kilograms or 4.5 kilograms. It would be less. And I think it's well enough known that in a cooperation agreement, you don't go into it completely blind. There are promises. There are assurances. There's an understanding. And if you are the cooperator and you're confessing stuff that the government can't prove or disprove, then you're almost never punished for it. It would be hard for the government to take a confession given during a cooperation agreement and use it against somebody over his objection at sentencing. I think it was illusory. I don't think that the admission of the amount – So you think – so you get a two-level downward departure for cooperation, right? But you're starting at a higher level because you've admitted to a certain quantity of drugs. Yes. Have you done the math on that? Does it work out like if he had admitted to some smaller quantity? Do you see what I'm saying?  It's not clear to me. It seems to me that he's exposing himself to a very high level from which he will get to if the judge accepts the cooperation agreement. Yes. His punishment would have been the same as what I've said Mr. Nip should have for the charged crime of 60 months. The downward departure was from basically the 100 – Well, Mr. Nip is a criminal history category 2, Mr. Eldridge category 1. So their numbers are slightly different. But it would have been something like 150 months if Mr. Eldridge had been punished for what he said he did. But in fact, that was all taken off. And so that's why I think – and that was the expectation. It had to be the expectation of the parties. Otherwise, the government wouldn't get anybody to cooperate. On the second amendment issue that we have, Your Honors, it is a question of law. And in preparing, I've sort of asked myself, I don't know if that's music to the ears of an appellate judge or the most dreadful thing an appellate judge can hear, but it's a question of law. The second amendment is quickly evolving these days. But as, Your Honors, you know that the first question is the conduct. Does the conduct fall within the scope of the second amendment? Why do you think it does? Because on the plain text, right, to keep and bear arms. The conduct at issue here is not about keeping and bearing arms. It's about purchasing an arm for somebody else. Indeed. The good case law as it has been developing, I think it sort of started with – it's not yet binding at the Supreme Court level, but several of the justices have said that the second amendment does not apply merely to the possession of a weapon, but can affect, the word is, conduct that involves a necessary corollary to the second amendment right. So, for instance, the sale of bullets, obtaining bullets is something that I think Justice Thomas said would be within the larger – So, I would agree with you on the theory that if an individual has a right to possess, the individual has the right to undertake the task that made the possession possible. But your client isn't the one who sought to possess the gun, it's Eldridge. So, it's still, it's not obvious to me why you should be able to enforce Eldridge's right. Well, his, the conduct, whoever makes the transfer to Larry Eldridge, the conduct is the necessary corollary. If no one, and really no one could legally do it, anyone who made that transfer would be in violation of the regulation. So, it's the transfer in this case that is the conduct that we start with. And if the transfer were not, then Larry Eldridge could have every right to get a gun, if he's not dangerous. And yet, everywhere he would go to, no one would provide him a weapon. It's just that it's ordinarily, you don't get to assert the constitutional rights of other people, right? So, it's Eldridge here who has the second amendment right. Well, I disagree, Your Honor, that only Larry Eldridge has the right. The conduct, and I think we always start with the conduct. You look at the conduct in the test, and what is the conduct, and is that with either protected explicitly by the second amendment, or as we say, it's a necessary corollary. It is the right of the person who is making the transfer, if that conduct is within the scope of the second amendment. I think that, as a necessary corollary, our founders would have said, yes, it is. We're not going to create a right for everyone to be able to have possession, everyone who's not dangerous, have possession of a firearm, but envision a world where the government can forbid all sales. They would say, that's not how the second amendment works. There has to be some ability of people to make those transfers. Thank you, Your Honors, very much. If there's nothing else. Yes, thank you. We'll hear from the government. Good morning to the court. I'm Andrew Smith from the U.S. Attorney's Office down in Lexington, Kentucky, on behalf of the government in this case. If I can, I'd like to begin where my colleague did, and that's talking briefly about what he referred to as kind of the other story in this case, where he's referring to the background evidence, the res geste evidence, that the court properly admitted in this case. That was raised in a pretrial motion. The court heard an argument on that and properly concluded that it wasn't subject to 404B because it was admissible background evidence, which was fully consistent with this court's guidance over a number of years. Just briefly, that prior background evidence told the jury a lot of what it needed to know to properly adjudicate the three claims. Well, it certainly told them a lot. Like, it was pretty extensive testimony. We normally think of res geste as being, you know, sort of laying the background. Like, how does the officer suddenly arrive at this house? Oh, maybe there was a confidential informant. It's kind of minimal. This was pretty extensive. I see your point, Your Honor. I think that's a fair question. I think when we look at the totality of the transcript, the actual amount of time that was devoted to this testimony actually wasn't that long and substantial. But, again, putting it all in context about what he was telling the jury, again, setting it back to what the case was about, the idea is that Niff, the defendant, knew Eldridge, and Eldridge was the recipient, the one who was buying drugs from him. So to put all of that into context, first, how did they know each other? How did the investigation begin? How did their interactions in those reported transactions, which were kind of cryptic at times, how did he know what they were talking about? All that required some exposition at the front end about their relationship, how they knew each other. So he explained to the jury that he had met Eldridge in a bicycle club, how he came to start using methamphetamine because Niff is the one who gave it to him, supposedly for pain, and that set in this course of dealing where he started buying ounce quantities of methamphetamine going forward. I think it did seem like there was a much larger amount of quantities, so do you think you needed to really get into that as background evidence? So it seems like I think part of the argument is the background evidence was almost the tail wagging the dog in some respects because it was a much broader time frame, much more transactions, much higher quantities. Why would you have to put in quantities to show the relationship? That's a fair question. So in other words, could they have kind of neutered it down saying just I bought drugs rather than a specific amount? Possibly, but again, the jury I think fairly put should be able to fully consider what that witness was. And keep in mind that the deals at issue here were each for ounce quantities, which I think the court would probably recognize are what would typically be considered distribution amounts. That is consistent with what he said before. So it had probative value about not just that he was buying drugs, but how much he was buying drugs. And that again puts in context when you have the actual crimes that were charged, when those transactions happened, how much was he buying? He was buying one ounce at a time just like he had before. Maybe it was not quite the same frequency, but that is still a probative fact for the jury to understand. And again, there are things about the testimony, the evidence that came in. For instance, the car he was driving, there was a text message where they referenced toys. Other things that a jury might fairly wonder, how does this guy who is testifying know what any of that means? How does he recognize him? How does he know what we were saying was a drug use? Would some of this actually be admissible under 404B to show intent or other things? Why didn't you try that route? Well, I think it's often our preferred course of action. Res geste is deemed to be not within the ambit of 404B. So we start there. You don't require limiting instruction. The court properly decided that. I do think if the court were inclined to do that, you could affirm on that alternative basis. There is ample case law in the Sixth Circuit that says crimes like drug distribution, where you have to prove an intent to distribute, course of dealing past drug trafficking activity can be admitted for that intent purpose. So you're correct. You could do that. It just didn't get there in this case, because in our view, the court got it right on step one with the res geste. But the reason you didn't want to go that alternative route is because you wanted to avoid limiting instruction. That's a good problem. It happens to me, too. Didn't the instruction just say he's not on trial for these actions? That's right. I don't think that that was the reason. I think it was just, again, I wasn't trial counsel, but I believe the view was it was very clearly background evidence. The reason the government wanted to introduce it was to set the scene. Again, they had to explain how did he start cooperating. I remember the reason he started cooperating was because he'd been arrested. They found drugs in his house. Where did those drugs come from? It came from NIP. Can I ask a practical question? Can defense counsel not get a limiting instruction if the evidence is admitted for purposes of res geste? In other words, as defense counsel, couldn't I object and say, well, you've heard all of this as background evidence, but I'd like an instruction saying don't consider that? Yeah, I think you certainly could try that. I'm not aware of a rule or a holding that says you are entitled to that. Just practical experience. You're never entitled to the limiting instruction. Yeah, I think judges may be, depending on the facts of the case, how it's being used, maybe they would entertain that. That's certainly possible. But critical here is that was never requested. That wasn't brought up at the charge conference. They just said we don't think that this should come in, Judge. The judge says no, it's res geste, and it was admitted. Critically, and we've made this point up brief, consistent with our view of why it was admitted, it's how it was used as well. The government didn't really reference this in closing argument. It was never used for a propensity purpose or to kind of dirty him up for the purpose of thinking he wants a drug dealer, always a drug dealer. But it was very necessary for the jury to understand how does this guy sitting on the witness stand know what he's talking about? How does he know the defendant? How did he come to cooperate? The cryptic or otherwise kind of ambiguous things that he referenced from a harmless perspective about the videos aren't that clear. In some ways, that makes the testimony and background more important because it gives more credibility to him knowing, yeah, this is why he did what car he drove. This is when he said the word toy. This is what we met. All that had probative worth that the jury probably heard. And again, Judge Markey's racist. Our view is even if you got past all of that, this is still subject to harmless error review. The evidence on all three counts was corroborated with video, with law enforcement testimony. The case was overwhelming, so it would still be harmless at best anyway. On the sentencing issue, I think the court's already distilled this, but the short answer to a lot of what was raised by counsel is those factual determinations about how much credibility to give to Mr. Eldridge's testimony, that's reviewed for clear error. There isn't a basis to disturb that factual finding. Again, the district court was in a position here to hear his testimony. All the suggestion that it's kind of uncorroborated isn't quite right. Again, keep in mind the context into which Mr. Eldridge's cooperation began was he's arrested and found with drugs there on the scene that he says Nip gave him. So that's initial. Those drugs came from somewhere, and those weren't part of those initial transactions. And then his testimony and then the entire trial itself was corroboration of what he said. Are you aware of a case, so usually at a sentencing context, the district court, we have just a pretty lax reliability standard at that stage. We even allow hearsay. Are you aware of a case where our court has overturned a district judge's factual finding at sentencing tied to actual trial testimony under oath, as Judge Larson mentioned with the agreement as well? No. I mean, if anything, what I'm familiar with is a lot of cases that talk about the deferential standard given to the district court. And again, also within drug quantities particularly, that so long as the judge is making a conservative estimate that it's probably fine. And keep in mind that the judge here took a more conservative tact than what was initially recommended in the PSR and went for a more limited amount of time and a more limited quantity. And again, this idea that, well, he had this motivation to kind of beef up his drug quantity in his plea agreement because he was anticipating he was going to get a 5K reduction, I guess that's a theory, but I don't think there's any basis in the record to think that. And there's some real reason to kind of doubt that logic. That would be a pretty big gamble to say, I'm going to bite off a huge drug quantity here on the hope that I get a discretionary motion from the government and then the court, in its discretion, also reduces. Keep in mind, we've talked about promises. In our district, and I think consists elsewhere, there are no promises made in advance that you are going to get cooperation credit. We just make clear that it's in the government's discretion. If you cooperate, we'll consider it. There was no promise at the time of this plea agreement that he's definitely going to get some quantum of reduction. So again, just disbelieving the amount that he put in that plea agreement on the basis, I think is pretty suspect. Turning to the Second Amendment claim, I think the court has properly asked really what the first issue is. If we get, I guess, to redirect the court, we do think that this court's recent decision in Williams where it found in a facial challenge, which is all we're dealing with here is a facial challenge to the statute, and in Williams said, facially, the felon possession statute is facially constitutional. By that logic, the statute that prohibits transferring, giving a felon a firearm, also has to be facial. So we have pre-Dobbs case law that suggested abortion providers can provide abortions to women even though the women have the right. If the state regulation of the abortion providers had the effect of eliminating the right, that logic seems to me to apply full heartedly in this context. So the question would just be, does the law issue effectively bar the individual who has the right from exercising the right? That's right. In this case, wouldn't it be Eldridge, and maybe they could have made an as-applied challenge that Eldridge does in fact have a right because a child's abortion conviction is not sufficient? It's possible that there's a pathway to an as-applied challenge. We don't think the court needs to adjudicate that issue here. I don't think it's really as well teed up as I think the court would prefer it be to make that kind of decision. There are a variety of third-party standing cases that come out of the contraception and abortion context. I'm aware of those. You didn't dispute his standing towards this claim, did you? We did not raise standing. That is true. Does he have Article III standing? I think the third-party standing doctrine is typically deemed to be a prudential standing consideration, I think, in the Supreme Court's decision. He's in jail. Yeah. So he probably has an injury. Sure. But also keep in mind, standing to assert what? And the way that he has brought his claim is, I have this right to transfer a gun because it's necessary to affect somebody else's right. So certainly he would have standing to say, I have the right to transfer a gun. The question just becomes, does he? And under the plain text of the Second Amendment, the government's position is no, and that's fully consistent with what the court, it's kind of reassurances that were given in Heller and McDonald and this court's decision in Bacon, albeit on plain error, but was pretty explicit in saying there isn't any authority saying there's a historical tradition or there's a history of the Second Amendment giving the right to transfer. And again, the court doesn't even need to go that broad here. All the court needs to say is there's not a right to transfer to a felon, which is, of course, more pronounced. And that's consistent, for instance, with what this court recently talked about, Oakland Tactical Supply, where it talked about, albeit in a civil context, but construing the plain text. And it cautions that especially when we are getting to these necessary corollary rights, which the court recognizes are a step removed from kind of the core step, the core Second Amendment right, we need to be extra careful, in particular, with how we define and articulate what the conduct is and what the right is. And so here, it's not just writ large. I think you need to be careful with it. You suggested that there is a right to transfer. It seems to me, in the abortion context, that there was no right of the provider. It was the right of the woman. And if a regulation of the provider had the effect of eliminating the right, then it might be problematic. So I could give hypotheticals where maybe gun regulations affected one manufacturer harshly, but the ordinary people that are subject to the Second Amendment could get guns from other providers. And I don't know that that would necessarily raise a Second Amendment problem, because the people who have the right to possess it would be able to get it from other entities. And to be clear here, I hope I didn't misspeak. The government's position is not that there is clearly a Second Amendment right to transfer a firearm, much less transfer one to a felon. So I think you're right, and I hope we're on the same page, that the government's position here is that, step one, the right to give a felon a firearm is not something that is covered by the plain text of the Second Amendment. So, again, there may be recourse for someone, but the right is to bear or possess the firearm, or, as you've already alluded to earlier today, maybe that then leads to the right to acquire a firearm. But for who to acquire? It's the possessor, right, the person holding the right. That doesn't mean that, in this case, that Mr. Nibb had an independent right to sell a felon a firearm or give him one at a gun show. So, again, it's step one. We think you don't go past that. But even if you did, the same historical tradition the court talked about in Williams easily supports the regulation here. It's the same conduct, right? It's whether there's a tradition of disarming dangerous people. On a facial challenge, we have to just come up with at least one scenario in which that would be plausible. Obviously, there are dangerous felons, as the court in Williams recognized, that would be fully consistent with our nation's tradition of disarmament. And, again, I think even if you had to get past that from the historical analysis, we cited some other non-exhaustive examples, but there is a tradition in this country of regulating the manufacture and the sale of firearms, of gunpowder, who can get a gun and to whom you can give a gun. And we cited some examples of that going back to colonial times and forward. And with that, if there are any other questions, I'd be happy to address them. No? All right. Well, I thank the court for its time. Thank you. We'll hear rebuttal. Thank you, Your Honor. I'll be very quick, only a few points. Mr. Smith brought up the question of the lingo that was being used between the two men and how introducing past acts could help explain the lingo, but that's not what happened in the case. There was never an attempt where Mr. Eldridge was asked, well, how did you use this word and why did you use it? Those old, the early story, didn't help. It wasn't relied upon to explain that. And I don't know that it could. There were no text messages for the earlier dealings if they happened at all. So the repeated problem with the earlier conduct is that it just simply didn't tie in to the case being tried. Your Honor, you mentioned at one point a kind of relaxed reliability standard for criminal sentencing. And I might push back on that just a little bit and say not relaxed reliability so much as relaxed admissibility of information. If the information is unreliable, whether it's backed up with good, strong in-person testimony, if it's just not reliable, then it should not be counted against a person in sentencing. And we do have repeatedly, at least I speak as a defense attorney, where the crime of conviction is almost an afterthought when the sentence is handed down. And nobody I've ever represented in a case like that has ever been able to say, that sounds fair, you know, I think I understand. Yeah, but that's, I mean, I understand your claim. But what you're going against is this whole idea of real-event sentencing. And that's sort of baked into the sentencing guidelines and the Supreme Court had a big fight about this in Booker and it came out one way. Whether we think that's right or not, it is what it is. Indeed. But I would say that in a case where there's no corroboration for all of the extra weight, it's more important for a judge to be careful, I think, maybe act with greater restraint when it comes to the enlargement of a person's punishment, doubling it, more than doubling it, on the basis of a word of a guy who was basically compensated to say what he said. He had this downward departure, he was able to say it without any real harm to himself. Do you know of a case where we've, I mean, this is, a lot of these cases, you should overturn this factual finding because it's based on hearsay or something to that effect. It's atypical for us to get a claim based on live testimony under oath. Do you know of a case where we've overturned a sentencing based on that? I do not, Your Honor. So this would be a first? Yes. And could you have asked for a limiting instruction once this evidence is admitted as res geste as opposed to as an exception to 404B? I don't know if you were trial counsel, but... I was not, but I have asked myself the same question. In fact, the judge said, I'm letting it in and I am not going to give a limiting instruction. I think that, as Mr. Smith accurately said, you can ask. And a judge might be inclined in the nature of fairness to say, yeah, let's... or at least give a direction to the prosecutor. Don't hit this too hard. But I don't think that the defense counsel could have insisted on limiting instruction. Thank you so much. All right, thank you. Thank you very much. Thanks to both parties for very helpful arguments in kind of a novel case for us. So thank you very much. We appreciate it, and you'll get an opinion in due course.